141527 ClearCorrect Operating v. ITC. Mr. Myers, whenever you're ready. May it please the Court. Transmissions of electronic information into the United States are nothing new. Four decades before the TerraFact that we're here talking about today was enacted, the U.S. Supreme Court in by wire, concluding that that was commerce, but also concluding that it was a very different kind of commerce from the trade in tangible goods, and that one set of regulations... Well, let me ask you, firstly, just a couple questions. When you say intangible goods, now the parties in their briefs are putting some adjective before every term. Is it your view that goods is broad enough to cover tangible and intangible goods? No, Your Honor. If I did, I misspoke. My point was that when the Court was talking about two sets of regulations, one was for the trade in goods, including commodities, and the other was for this electronic transmission of information. Well, why isn't the electronic data here simply a type of product? And if so, why ought not the information be covered under its jurisdiction? Good question, Your Honor. Several reasons. First, the product of – the transmission of information is not a product, and the authority over the transmission of electronic data was never authority granted to the tariff commission or the ITC by Congress. After the Supreme Court decided that these were two different forms of commerce, with that tariff act, but when it did so, it did not give authority over electronic transmissions of information to the old tariff commission. Instead, what it did is almost immediately pass the Communications Act, create the FCC, and give it centralized authority over all transmissions of information into the U.S. But by information, you're including – you're going beyond knowledge, right? You're saying information is embodied in some sort of digital electronic medium. You're not drawing a distinction between pure knowledge and embodiment of that knowledge, is that right? That is correct. I'm talking about – But you keep talking about transmitting information, transmitting electronic signals over wire. That's quite different, is it not? It is the distinction that I would think you would have to draw to support your theory. Your Honor, we may be misunderstanding each other. Information – No, I'm trying to understand what you mean when you talk about was granted to the FCC. Wire transmissions of electronic data, radio waves, telephone signals, now television signals and satellite broadcasts. Those would be the transmissions of electronic information that the commission – that the Congress gave to the FCC instead of the ITC. Well, the ITC's argument here is, as I understand it, that you're viewing this too broadly. That in this particular case, what they said was this particular type of data transmission that's at issue, not all data transmissions. And that here, you have a data transmission that is capable of being of electronic data. And while they say this can be crystallized into a product in short order, now so can many things. This transmission of information is no different than a telephone call, television signal, radio wave. Morse code, it's the same thing. It is an electronic surge across a wire. That's all it is. The character of the transmissions have not changed since the mid-1800s. Maybe the quantity of data has, but the character of these transmissions is no different. And Congress never gave the Tariff Commission or the ITC authority to regulate them. And in the eight and a half plus decades since the time this Tariff Act was passed, no court has held, no agency has held, and no one has ever even really argued until just now in this case that the transmission of an electronic signal, streaming information, would qualify as an imported article under the Tariff Act. In Suprema recently issued, the court concluded that a lot of deference would be owed to the ITC with regard to matters involving a statute. Why doesn't that carry over to this case in terms of the deference that would apply to their definition of article? Because the deference would only come into play if the commission had been granted the congressional nod of authority over the subject matter. Once Congress hands over the authority, then we would let the commission regulate it. But that never happened here. The ITC and the old Tariff Commission… What would Congress have had to say to give them the authority? Would it have had to say, and the ITC has the authority to regulate electronic commissions? What would Congress have had to say in order for us to conclude that they have the authority? Well, Your Honor, assuming that Congress understood the Western Union v. Pendleton case where the Supreme Court called this commerce, I would say commerce. And to be specific, in accord with that opinion, it would have said commerce both for electronic data transmissions or intangible signals or waves or wire transmissions. Whatever the court was talking about in the Pendleton case would be the same there, but Congress didn't do that. Congress did not say commerce as the Supreme Court has described. It chose articles, and then it turned around and immediately gave all the data transmissions to the FCC. So just you and I having this conversation, I would say if they wanted to make that clear, they would have just used commerce instead of articles, something that denotes tangibility. Even the commission is going to stand up here in a minute and say if we look at the contemporaneous dictionary definitions from the early 20th century, we can look at the word article. And we can take these transmissions, streaming transmissions of information, and we can stuff it into what I think they call the outer bounds of the dictionary definition. But when we look at those same dictionaries, they always refer to tangible items when wanting to make a specific description of order. We saw this changing more rapidly than we ever would have thought. They passed the Patent Act in 1952. No, Congress didn't have in mind stem cells and nanotechnology. But we've morphed. We've said we have authority, and therefore we're going to adjudicate those cases, notwithstanding that clearly in 1952, Congress had never contemplated that. Why is this situation different than that in terms of the ITC's authority? Because Congress did contemplate it. Like I said, there's nothing new. The wire transmissions, these internet transmissions, those are just pulses of data over wire, exactly like the Morse code in the telegraph machine. Again, the quantity of data may have changed, but the character of the transmission has not. Even beyond that, by the time this tariff act was passed, and certainly by the time the FCC or the Communications Act was passed, we not only had the wire transmission, but radio and telephone, with television soon to follow. Now, on top of all this, Your Honor, we know that what the commission is trying to do here, taking an ancient dictionary and trying to stuff a definition into articles that are important, is not the proper way to approach this statutory interpretation. What we know from Yates v. U.S. is that we have to look at it, we have to look at a reasonable definition of the term in the context of the statute. So to agree with you, we would have to agree that subject matter that is subject to patenting or copyright nonetheless is excluded from the general allocation of authority to the commission with respect to patents or copyright. Is that right? Yes, Your Honor, if there is no importation of an article. That is correct. So that the remedy, you're not saying that there is no remedy, but the remedy is only in the district courts, not by way of importation? Correct, Your Honor, and this case is a perfect example of that. A line is going to get its day in court. It's going to get two. It sued clear correct in a Texas U.S. district court alleging 400 plus infringements of patent claims. And so in the statute, we must read an exclusion into the broader language of the statute, the ITC statute. Your Honor, I don't read it as an exclusion. I read it as your ticket to get into the ITC, you have to have the importation of an article before they should be able to hear your case, and here there wasn't one. There was a stream of data from a domestic server, from a foreign server to a domestic one. Well, let's say that we view data as an article of commerce without trying to get into a finer definition than that. Again, going back, as the Chief suggested, to the time when articles had no exclusion. Where does that take us in your reasoning? Your Honor, I don't think it takes us anywhere any different from where we've been for the last eight and a half decades. The statute is clear. It's not ambiguous. We're not arguing it's ambiguous. They're not arguing it's ambiguous. Articles in the context of this statute means something that can be intercepted at the customs house, stamped with a trademark, broken in transit, put on a rail car. That's all out of the legislative history that this court reviewed in Bayer AG v. Housing. And while we disagree on the holding of that case, what's indisputable is that this court held that articles in 271 are the same articles in 1337, and they were never intended to reach information. All right, so you both argue that we never get past Chevron step one. So you both say it's unambiguous, and so we could obviously fall down on either side of that fence. So assuming we disagree with you, what is your best argument otherwise with respect to your direct appeal? Okay, so we do step Chevron one. We've got an ambiguity. Chevron two, reasonable. Not reasonable here. Very clear deviation from congressional intent. No, you missed my point. What if we find that they get past Chevron and we're going to go forward? And so what is your best argument with respect to the other aspects of your appeal? Oh, I'm sorry, Your Honor. I misunderstood. We have three. Based on the time commitment here or the time allocation, we've got the commission erred on the contributory infringement finding that the patent claims were invalid and that there was a 2011 covenant not to sue that has the same specification and disclosure as one of their asserted patents. And because the claims here are so mind-numbingly similar, it should expand to that. I only have two minutes and 45 seconds left, so why don't I take on contrib for just a second. There was a finding by the ALJ of no intent to cause a direct infringement. That can't coexist with the contributory infringement finding. They rely on a presumption. The evidence the ALJ found should have nullified the presumption. The commission notes well in bold and italicized letters that these are just instructions on how to make a physical model that then makes the aligner, and they have no separate commercial value. Instructions typically are induced infringement under a 271B, and if we say they're now a contributory under 271C, then 271B becomes surplus, and that violates the canon of construction. The substantial non-infringing uses. Here there were several identified in the brief, and finally… These were all hypothetical, weren't they? No, Your Honor. Like the doctors… There's no actual evidence that they've ever been used in those non-infringing ways? Yes, Your Honor. There were. Like the doctors would look at the – you have a scan of the crooked teeth, and then you come up with the straight teeth. And the doctors have to approve that prescription, and that's what they were doing with this. As well as the other uses of just these models, they weren't hypothetical. They were the same models that Align was found to infringe on Ornco's patents. It's just taking digital models of people's teeth and using them to make aligners. It's a very simple process. And then finally, we know that out of 271C you have to have a material, and we know from this court's ruling in Farmistem you have to have a product. These terms denote making something, making something tangible. So when you stretch on articles, you're also stretching on material and product, because the material and the product are not a service. They are something you use to make something else, and I have 30 minutes. You're about up. We have 43 minutes of rebuttal. Thank you, Your Honor. Let's hear from the other side. You're splitting your argument, Mr. Rosenstock, here first. Thank you very much for rescheduling. I want to follow up with just a couple of points in response to the appellant here. This argument about the FCC is a complete red herring. Can I stop you there for a moment? I'd rather start, which is in your summary of argument, which is only a page or a little more than a page, you make the very salient statement that we shouldn't lose sight of the fact that this is a case about teeth. Well, Markman was a case about dry cleaning, but nobody thinks of Markman as standing for anything about dry cleaning. It stands for an important legal principle, and in my view, so does what the Commission has done here. So I don't quite understand how you're trying to cabin what's going on here. And just to supplement that, you go on to sort of say, if I'm understanding correctly, that, you know, these Internet service providers are all worried, but this isn't that type of case, and kind of don't worry, we'll get that case, and we'll decide it on the facts and the record before us. It does seem to me that if we were to affirm the Commission here, we would be saying that the ITC has jurisdiction over electronic transmission. I don't see very many limiting principles there that might apply to future cases, do you? I do. The reason why we say it's about teeth is because what was imported here were the data sets that previously had been imported as the physical models. ClearCorrect, to evade a consent order that it agreed to, chose to... But this case is about whether or not the ITC has jurisdiction over electronic transmission. Of electronic transmissions that represent digital goods. And that's what's going on here. How do we draw that line? How do we know that that electronic transmission represents a digital good? Well, the Commission here found that these were items that were bought and sold in commerce exactly the same way that their physical counterparts were. Indeed, exactly the same way that the exact physical counterparts were in the previous investigation. In addition, we have cases like EuroDIF, in which the Supreme Court has instructed that case involved merchandise for anti-dumping and countervailing duties. So your view is anything that was bought or sold in commerce? Well, our brief disclaims coverage over services. But anything that's a digital good. Digital goods exist. It's a term that's used commonly now in international trade. Our brief discusses our free trade agreements with Australia, Korea. There are a dozen others that talk about e-commerce. Other than just services, what would be excluded then under your series? It would be digital goods. Now, there is a limiting factor in response... So you're saying digital goods would not be excluded. So what would be excluded? Digital services, phone calls. If I call up someone, that's not something that's bought and sold in commerce. That's not an item of commerce, as the Commission found on page... But anything that would be data streamed, for instance, that would be bought and sold in commerce, right? Well, it might or might not be. It depends on the nature of it. I'm not here to tell you exactly where the line is between goods and services. Thinking about Eurodiff, in which Justice Souter for the court explained that taking my dry cleaning to a cleaner would certainly be a service. One can imagine digital services that are the same way. Strong arguments can be made that if I'm relying on cloud storage for people to hold my files for me, and then I retrieve those same files later on. Well, that looks an awful lot like the services that were discussed by the Supreme Court in Eurodiff. Now, besides the fact that we have digital goods here as a limitation, we also have all the limitations of substantive law here with regard to the ISPs, if the ISPs are what you're concerned about. In a future case, the Commission applies all of the defenses, legal and equitable. The Commission would apply the DMCA safe harbors. To the extent that ISPs are immune from liability in the district courts, they would be immune from liability in the Commission. Can I take it back to the question we were discussing with your friend about the definition of articles? In the Commission's opinion, and I think this appears at page 39, which is 199.43 in the appendix, I guess I'm a little confused. It says the Commission, in its discussion of this, says it concludes the plain meaning embraces, quote, a broader meaning that describes something that is traded in commerce, end quote. But the dictionaries, the multiple dictionaries that are cited in the footnote and otherwise, seem largely to define articles as material things. So to me, when I'm reading this, there's a disconnect between the definition the Commission comes up with and the references they cite in dictionaries to support it, particularly in the footnote. Do you understand what I'm referring to? I think I do. First of all, what I believe to be the leading dictionary, which is Webster's first new international dictionary, which dates from- Is that one that's cited in the text on 39? It's the right time. It's the leading dictionary. It's been relied upon by this Court in countless decisions, including Bayer, NSK, Design, Prinko, NTP, Enercon. And the definition of article was used by this Court's predecessor in Imar v. Amen, as cited in our brief. That definition is broad. There's no argument that that definition is narrow so as to encompass only tangible things. Now, I'm aware of a dissent yesterday by this Court that looked to a 1980s dictionary for article and found a narrow definition in Black's Law Dictionary. For purposes of this case, I don't think that's the right time frame. But even if we assume that there are different dictionary definitions, that's just a question of Chevron. This is the Commission interpreting its organic statute through the process of formal adjudication. How does the Commission ever enforce this kind of order when it's supposed to be enforcing these through customs agents at the border? I disagree with the premise that everything that the Commission does is and should be enforced by customs at the border. Cease and desist orders are not enforced by customs. They've never been enforced by customs. The way that cease and desist orders work is if we have a violation proceeding, such as here in the cease and desist order issues, the complainant, if it discovers that the respondent, the adjudicated infringer, is violating the cease and desist order, it institutes an enforcement proceeding at the Commission. And the result of that is that the Commission itself, or through efforts with the Department of Justice, the assistant U.S. attorneys in whatever judicial district the respondent has its assets or presence. But aren't the cease and desist orders supposed to be supplements to an exclusion order, not substitutes for an exclusion order? No. What we know from 1974 is that Congress said that the cease and desist orders, when it's so extreme or inappropriate, that it's likely to result in a finding of a violation. But I think Judge O'Malley's point to be one with which I agree, which is they're not supposed to be a filler because exclusion orders wouldn't possibly work or be able to be effective. They were supposed to be a supplement. I think looking at the legislative history, they thought exclusion orders were just too severe in some circumstances, and that was leading the ITC to not do anything. So they said, okay, when exclusion orders might be too severe, we're going to allow for cease and desist. But that assumes that exclusion orders would otherwise be applicable. It's just we don't think they should be introduced here. Not, as you say, that when exclusion orders can't possibly be effectuated, that's when we go to cease and desist orders. I have two responses to that. First of all is we're interpreting the agency's statute respectfully. I think that a lot is being read into a few sentences of legislative history in 1974 that could be fairly read the other way, and that's the agency's prerogative with its organic statute. Secondly is there are plenty of circumstances in which a tangible item would have problems with an exclusion order. Think about when these statutes were enacted. In 1922, 1920, and 1930, it was the height of prohibition. I mean, those were not, lickers coming in weren't something that was going to be subject to effective customs enforcement. Also, as we discussed in our brief. Why not? Well, because the customs agents work at the ports, and if you have people bypassing the ports, then there's essentially no relief. In addition, commission remedial orders are prospective. So what happens when, and this is discussed in our brief, what happens when you have a respondent who tries cramming its merchandise into the U.S. ahead of the issuance of remedial orders? Cease and desist orders work for that purpose, too, and a respondent under those circumstances would be far more burdened by a cease and desist order than by an exclusion order. Can I ask you about one other matter before you sit down? And I think you probably already know this because it was highlighted at least in a recent law review article, which you may or may not be familiar with. But the point I'm making is that if you go back, the commission cited a provision of the legislative history found in the Senate report, and you repeated it, I think, in your brief, but the commission relied on it pretty heavily in its opinion. Well, it turns out that when you look back to the source of that Senate report, the words in the importation of goods has been deleted from the quote that's been found in the commission report. Are you aware of what I'm talking about? Have you discovered this? I'm not telling you this for the first time. I've read the law review article. It's replete with mistakes. Well, I don't think this is a mistake because I'm looking at the copy of the Senate report that was in our library. And the quote that the commission used deletes the word importation of goods from the quote without an ellipsis. I apologize for that error. I'm accountable for what the brief says. I'm not talking about the briefing. I'm talking about the commission. I mean, the commission's opinion in this case relied on that quote with the term goods extracted without an ellipsis or anything, right? Well, I'll apologize for the commission then. But that certainly wasn't the commission's intent here. Believe me, I'm not trying to ascribe intent. My question really is now that we all know what the real quote is, don't you think there's a difference between the quotation if you insert the phrase of goods in the quotation? Well, absolutely not. I'm sorry to step on the end of the sentence. But absolutely not because the definition of goods from the relevant time frame is just as broad as the definition of articles. Well, if you weren't afraid of that phrase, why did it get an ellipsis down or not an ellipsis down? I was not working on the case at that point. I can't imagine why that is. I can apologize on behalf of the commission, but there was no real intent with that. But goods were defined broadly in 1922 and 1930. We know that the original version of the act in 1922 used the word merchandise. We know that the Senate report referred to goods. And we know that the final version as enacted in 1922 included articles. Contemporaneous dictionary definitions at the time were all broad enough to include what had come to be known as digital goods. And I note that the court yesterday inflated the terms goods and articles repeatedly. And that's consistent with our position here as discussed at pages A199.44 where the commission explains that its definition is such items as are bought and sold in trade. At page A199.48 where the commission itself acknowledges that the terms were used interchangeably at the time. There was nothing in yesterday's opinion that interpreted the term articles. Yesterday's opinion assumed that articles was a tangible item and then interpreted the word set in French. That is true. What yesterday's opinion also did, and I'm not suggesting that it's outcome determinative here by any means, is that the court there replaced reference to the word articles repeatedly with goods. Right, but that wasn't an issue in the case. That's correct. As I said, it's not outcome determinative here. I'm just pointing out that the court there treated these the same in the same way I think that the chief judge reading the Senate report would treat articles and goods the same. And all of those terms are broad enough at the time to encompass what had come to be known as digital goods or for purposes of a trade promotion authority, electronically delivered goods. But how does that fit with your opponent's comment that when you start to talk about the kind of information or technology that's here imported, there is another agency, another federal agency that is charged with overview of competitive practices in that field. Well, the FCC has no such authority. No such authority has been pointed to us. The agency that actually exercises that authority is the FTC, and it does so based on its 1914 organic statute, and that's discussed in our brief that regardless whether you're dealing with the FTC, which is before the Communications Commission was created, or the SEC, which again is an early act, we don't have people yelling and waving slips of paper in the air to trade stocks anymore. The nature of those agencies is that their organic statutes are broad enough to encompass trade in its various forms, and that's our position here with respect to articles and digital goods. Okay, thank you. We're way over, Mr. Kennard. We're going to give you your time, but if you'd like to yield some of it back, we have no problem with that either. May it please the Court. I'd like to address first the contention that there's a categorical exclusion of information products in the term articles. The Supreme Court has held that articles of trade are not limited to physical articles, and specifically that they may be information products. Isn't it telling, though, that Congress has been grappling for them for several years about how best to deal with any kind of governing of this trading of information on the Internet, and especially as it relates to copyrighted materials, and has yet been able to really come up with the proper solution because there's so many issues to balance? Doesn't that tell you that Congress believes that it's its role, not the ITC's role, to draw those balances? I don't think that you can deduce that there is no authority at all. Many of those proposed legislations created far broader authority, addressed the financial institutions and carriers and the like. But it didn't propose any authority in the ITC on that. I think the international trade, if I remember correctly, and I'm not positive of this, but I think there was a role for the ITC in at least some of the legislation. But I think it's also important to know that ISPs, like telegraph companies, are carriers. They're not importers. They're not subject to the jurisdiction of the act. They don't trade digital articles. So there is a very, I think, distinctive test that can be applied here. You must have a discrete item of trade. There must be importation, and there must be importation by the owner, consignee, or importer, and that's going to exclude carriers. That's why shipping companies, railroad companies, trucking companies are not subject to the ITC's jurisdiction in their role as carriers. So that's very important to maintain, and you asked about forms like streaming. Streaming may or may not. It depends what it is. For example, in copyright, broadcasting would be considered performance, not distribution. It would not be an importation. Forms of streaming that are more akin to broadcasting, I don't think, would be within the ITC's jurisdiction. But on a future case, a proper record on the nature of the transactions, applying that straightforward three-part test, I think that one can decide whether or not they're within the purview of the commission's jurisdiction. But here, where you have digital articles that are traded and that are, in fact, a representation of a physical article that would be a subject of trade, I think it's quite clear case for the exercise of the commission's jurisdiction. And since the term articles is capacious, it just makes no sense to restrict the statute to deny domestic industry the protections against unfair trade practices and against invasions of intellectual property on the completely irrelevant factor of an imported item's tangibility. Let me talk about some of your other issues, because I think we've had a lot of discussion from the government on this topic. What evidence is there in the record that CCPK did anything other than provide a service for ClearClear? Well, first of all, they waived that argument. It's kind of hard to waive the question of whether or not there is liability as a matter of law. I mean, you can't have liability in the absence of a sale. If there's no evidence, there's no evidence. There is evidence. And they're essentially an all-requirements supplier of these digital data models. They don't have other customers. And as the Supreme Court said in Eurodip, a sale did not have to be a conventional transaction, and that you rely on the expertise of the agency here. And so here, you effectively had, because it's a sole supplier situation, there was cost plus pricing as opposed to unit pricing. But it's still, what they did was they provided an article, and they were compensated for it, and they made profit on it. And so even though it's an affiliated trade, it's still trade. So I think that would be clearly within their purview, even if they hadn't waived the issue. I think they did waive it. So I think that there's clearly here a sale. There was also no evidence of actual substantial uses. All the uses Mr. Myers indicated were ones that were steps in the infringement. What's the evidence with respect to intent as it relates to CCPK? Well, first of all, I think the commission properly applied the expansion rule, which comes from MGM in the Supreme Court, that when there are no substantial infringing uses, you know of the patent, you're presumed to know that your products will be infringing. Was there evidence that CCPK knew of the patent? They didn't even make a proffer that CCPK had any reliance on the implied license, if that's what the court is asking about. They put some evidence of CCUS, but none of the relevant seller, which is CCPK. But I think that in any event, the implied license claim is so contrived that I don't think there could be any good faith reliance, and so it would be harmless in any event. I would like to address the question of the Beyer case, because I don't think that has come up, and I think that that is distinguishable on four grounds. First of all, Beyer was addressing, it was started from the proposition agreed to by the parties in that case, that if the term products made in 271G meant products manufactured, then the articles necessarily had to be physical. And the court reserved the question about what the meaning of 337 was, because the terms there are much broader, it's made, produced, processed, or mined. Second of all, Beyer did not attempt a plenary construction of 337, did not take into account, for example, the copyright jurisdiction, and by 1988, it's clear that copyright applied to electronic works. Third, even if there were a construction of 337 in Beyer, it's not binding on the commission under Brand X, because it's not based on the plain language of 337. And fourth, I think that the courts are correct to draw the distinction, even under 271G, that if a product is created by a process, as opposed to just merely discovering information or transmitting information, it's within the purview of 271G. So I think that Beyer did not control this case. The commission deserves deference, and what the commission properly did is reject an interpretation that would create gaping loopholes in the statute and invite evasion. Evasion through widespread electronic piracy of copyrighted works, and through the kind of sham arrangement that the ALJ found was devised here to avoid liability, because what ClearCorrect cannot do, having been subject to a consent order that arose from importation of physical goods, is try to defeat ITC jurisdiction by importing infringing digital goods that can be readily converted. Isn't there just enough opportunity for you to enforce the patent laws through your actions in Texas? Yes, but the remedy is here. And I think it's important to note, when you have a broad substantive prohibition, Congress would often expand the remedies to fully vindicate that prohibition in the rights and duties. And it really makes no sense to suggest that the substantive prohibition is somehow restricted by the original grant of remedies, even though those have been expanded. And I think the consent decrees, with the language of the consent decree, is it may be in lieu of an exclusion order. And even if the impetus of the legislative history was... But again, this is not a circumstance like in Suprema where the argument was made that if you don't, if you can't get the person who's doing the importing, who is sending it into the country, that somehow there's a gap in the statute and that there's a porous border. Here you have a situation where, according to your argument, it's ClearCorrect that is using CCPK, and that all of that activity is completely actionable in the United States. You don't have any gap in the statute or coverage. But I think the statutory... Most of the ITC's jurisdiction is going to be concurrent with the district courts. I don't think that excludes it. And the district court jurisdiction did not arise until 1994, so certainly after 1988, when you had it in 1974, since you've had this consent decree authority and the provisions enacted, I think the Commission's interpretation is certainly reasonable. Okay. Thank you. We'll move it up to five minutes on rebuttal to try to keep the time a little more even, if you need it. Your Honor, first off, I think the Commission may have some confusion about what is actually transmitted from server to server. They were talking about a digital replication of the item that is sold in commerce. But that's not this case. The way this process works and their claims are written is you have a digital model of someone's teeth in crooked position. And then in the straight position, you have another model. And then you come in and you gap fill the intermediate positions to move from position A, crooked teeth, to position Z, straight teeth. What you do with the digital models is you send them to a machine. And that makes a physical model. And then it's very simply a matter of thermoforming a plastic material on the top. So the information that is sent from the Pakistani server to the server in the United States is not what is ultimately sold to the doctor or the patient. It is bits and bytes of data that a machine uses to make a mold. And then the plastic is thermoformed on top of the mold. And then that plastic is the item that actually goes to the patient and is put in their mouth. So when the commission found, again in bold and italics, that these were merely instructions that had no separate commercial value, it is a very far cry from being the physical product that people buy to wear in their mouth to straighten their teeth. So I think there was some confusion on behalf of the commission on how far we are. The data coming in is two or even three steps removed because the data has to get treated once it arrives in the U.S. before it can even go to the machine to make the physical models that are then used to make the aligners. Now, there was a lot of discussion about where lines need to be drawn, what type of streaming information would go to the commission, and what type of streaming information might not be within the commission's jurisdiction. But this court in Bayer and the Supreme Court in AT&T versus Microsoft, and I believe it may have been Judge O'Malley in your dissent yesterday, there were great discussions about why expansion of these statutes has to be left to Congress. The dissent doesn't get you very far, unfortunately. But well-reasoned nonetheless. And here, what the commission has done is it has unilaterally expanded the scope of its own power, many times. The problem that occurs with a judicial opinion that just says affirmed is that there are a lot of issues here that are very difficult. I mean, this courtroom is probably chock-a-block full of all those amici who have their competing interests. But more, let's look at the petri dish we have just in this case. We've got the violation premised on some people in Pakistan who were writing some bits and bytes of data and sending it from a server there to a server in Texas. And that's the violation. But those Pakistani technicians could have just logged straight onto the server in Texas. And then we would not have any argument of an importation of digital data sets, and they would be hard-pressed to even find the importation of an individual keystroke. So the points made in Bayer and AT&T versus Microsoft and the one yesterday is well taken. And you brought it up in your discussion previously, is Congress has a lot of balls in the air about what we're going to do with this streaming information. And when it decides these issues like, well, could the Pakistanis just log onto a U.S. server, they're going to have their hearings and their evidence and their lobbyists and bills and draft bills amendments, all that good stuff, to come up with a rule that we can work with and all live by hopefully. And so the point is well taken that instead of the ITC just unilaterally expanding its own power to try and cope with this brave new world, which I suggest is really no different from the old world, this is a matter that should be left to Congress, and all the judicial opinions to that point are very astute. We thank you. Before we close the case off, the panel would like to request that within 10 working days, each side submit no more than 10 pages, double-spaced, on what, if any, impact our opinion, our mock opinion yesterday in Suprema has on the issues in this case. If the answer is none, feel free to just say that and not use your 10 pages, but we'd appreciate getting that information. Is that neat to everyone? So it's 10 pages for either side. You all may want to divide that or do the same one or whatever. In what form? Like a letter? A letter would be fine. 28 days? Yes. Thank you. We thank all counsel and the case is submitted.